YANA GARCIA Good afternoon, Your Honors. May it please the Court, I am Yana Garcia on behalf of Petitioners. I'd like to reserve three minutes, if I may, for rebuttal. The question this case presents is whether EPA can circumvent the Clean Air Act's express requirements in calculating emissions reductions offsets. RULE 13.18 PROPORTS TO ESTABLISH A FEDERALLY EQUIVALENT MECHANISM FOR ENSURING THAT OFFSET INTEGRITY CRITERIA ARE MET. ITS EQUIVALENCY SIMPLY CANNOT BE SUPPORTED BY THE FACTS ON THE RECORD. As you've just discussed in the preceding case, the Clean Air Act is clear in its requirement that offsets be based on actual reductions in pollution, and this requirement is integral to meeting the Act's purpose. Unfortunately, Petitioners find themselves before you here again because EPA has failed to cure the errors leading to this Court's July 2012 finding of invalidity, and its revised rule still fails to meet the Clean Air Act's requirements in two principal ways. First, in approving the revised rule, EPA has refused to apply the District's SIP-approved systems for ensuring offset validity, resulting in what is now a third method of calculating offsets from the District's internal bank, despite the fact that all three methods purport to be equivalent methods of calculating actual pollution reductions when applied each yield different results. Second, the method that is approved by EPA in effect amounts to an ad hoc mere listing of emissions reductions, and this listing cannot stand in the place of a federal integrity assurance system that is specifically developed and applied to meet the Clean Air Act's requirements. And as a result of these two categories of deficiencies, EPA's approval of this rule contravenes the plain language of the Act, of the Clean Air Act and the Administrative Procedures Act. With regard to the first category of errors, EPA failed to apply any approved system to calculate the offsets to which it was granting access from the District's internal bank. At the time of rulemaking... Why does it have to have an approved system? Why isn't it enough that it's a reasonable system? Well, the reason it has to have an approved system is because the plain language of the C-5 actually incorporates Section 7503 C-1's definition of offsets and says that that definition has to be incorporated into the SIP. And we know from the NRDC versus South Coast AQMD case where this court upheld the Central District Court's reasoning that in fact the language of the statute contemplates the offset integrity criteria being made effective through the SIP. So EPA was required here in this instance to have the District to approve a rule in which the District applied an approved system. And that approved system was embodied in 1315. Now, 1315 was also promulgated by the District for the express purpose of ensuring that the offsets in its internal bank could meet Congress's mandates as set forth in the Act. And before the District adopted Rule 1315, it applied an uncodified system, as you've also just heard, that was deemed to comply with the Act's requirements. Yet rather than requiring the District to apply either of these two systems, EPA allowed the District to create an additional off-the-cuff system for the purpose of this calculation only. Now this system, or method, also fails to validate the offsets that were issued to Sentinel. This brings us to the second manner in which EPA failed to cure, in the category of errors relating to the quantification and surplus adjustment methods that it claims it did apply. As an initial matter, the Attachment A spreadsheet relied upon to demonstrate offset validity is simply a list, which even when taken together with the additional documents on the record, fails to show that the District applied a system of federally equivalent offset integrity criteria. Now EPA attempts to refute this by claiming that it applied a conservative assumption in quantifying the emissions data contained in those documents and that it accurately surplus adjusted those quantifications. With regard to its first claim, despite EPA's assertions that two years of emissions data are not required, the only discernible systematic quantification method it appears to have applied in this case is the two-year method. Now the Attachment A spreadsheet shows emissions data for two years, in fact in most instances, but it fails to show two years of data in others. Now the problem here is not so much that EPA failed to... Where's the two years? I'm sorry? Where is it required that you use two years' data? There is not... So the Appendix S to the Code of Federal Regulations, which EPA relies upon for the discretion to apply one or two years of data or some other applicable method as appropriately warranted to demonstrate cyclical business conditions, does allow the District to apply either one or two years of data. Here, what appears to have happened is that the District applied in the same system or purported system one or two years of data arbitrarily with no explanation as to why one year is more appropriately warranted as to certain facility or equipment shutdowns in one instance but not in others. So the answer to my question is there isn't any. Do you remember my question? Yes. That's sort of the carryover to the answer. There's no requirement that they use two years other than one. There is no absolute requirement that they use two years. In fact, they are given discretion to use one or two. Yes, and that discretion is... So why isn't what they're doing exactly what they're authorized to do? I'm sorry? Why isn't what they're doing exactly what they're authorized to do? They said you can use one year, two year. Sometimes we use one year, sometimes we use two year data. What's wrong with that? In this instance, we're challenging the purported method that was applied here as to this specific rule. In this specific rule, EPA has failed to require an explanation. Neither EPA nor intervenors have a sound basis by which to prove that one or two years of data in the instances in which it was used in this case are more appropriately warranted. It's true, but that may be true, but so what? They're authorized to use one year of data or two years of data, and they use one year. Well, the purpose of that... Well, you say sometimes they say two years. They use two years, but they're authorized to do both. Why isn't that their pick? Because the purpose of that... What does it say they have to justify whether they use one or the other? The purpose of that authorization is to comply with the plain language of the statute, to actually ensure that there are actual pollution reductions. Now, to the extent that that is a finding on facts on the record, there must be an explanation as to why one year here but two years there makes sense. Why? You say that. I mean, if they're authorized to use one year or two years, why isn't that enough of an explanation right there? They're authorized to use one or two. They are an agency. They have expertise. They use their discretion, and they pick one of two. One or... They're given an option of using two different data sets, and they choose one of those. Why isn't that... Well, Your Honor, we are asking here... Where does it say that they have to explain why they choose one over the other? Well, they have to explain... What we're asking for here is that the rule be set aside as arbitrary and capricious. They cannot... The agency's deference is bounded by both the language that the Code of Federal Regulations or the mandate that the Code of Federal Regulations interprets is the actual language in the Clean Air Act. And the Administrative Procedures Act does require that the agency decision-making be based on rational facts that draw a reasonable inference as to how the EPA could have reached its decision. Here, there is... That is absent. There is no explanation as to why this system, this method, used one year here and two years there with no explanation, with no sound reasoning. Okay. Have I answered your question? Incidentally, it's the Administrative Procedure Act. Yes, the Administrative Procedure Act. Not procedures. Procedure. Thank you. Unless there are any other questions about the... There seem not to be. Go ahead and do whatever you're going to do next. I'd like to point out that we've raised examples in the opening brief that actually demonstrate as well why simply replacing one year of missing data in this conservative assumption that is not actually more conservative in a number of instances using examples that are listed in the Attachment A spreadsheet. Now, with regard to the rules purported surplus adjustment method, EPA has refused to discount its listed emissions reduction based on rules applied by the district between the time of permitting and the time of shutdown. Now, it's justified this failure based on an assumption that because facilities are generally required to operate in compliance with all applicable rules, their emissions at the point of closure are somehow inherently reflective of what would otherwise be surplus adjusted emissions. Now, this position is patently false and it's also flawed in its logic. If it were true, neither the statute nor its implementing regulations, or the district's own rules for that matter, would even have to specify that surplus adjustments be made. They would simply use the emissions data from the point of closure at any point. Now, EPA's refusal to apply the district's existing approved systems and its decision instead to apply what appears to be this ad hoc calculation method, which fails to show equivalency with federal offset integrity criteria, does contradict the plain language and frustrates the purpose of the Clean Air Act. As such, we are asking that this rule be vacated with instruction to the agency to conduct an entirely new rulemaking rather than simply supplement its initial invalid rulemaking with equally invalid revisions as it has done here. If there are no further questions, I'll reserve my remaining time for rebuttal. Thank you. May it please the Court, Amy Dona representing the Environmental Protection Agency. At Council table is Mike Carroll representing CPV Sentinel and Barbara Baird representing the district. I would like to allow them both an opportunity to speak today, four minutes for the district and one minute for Sentinel. In regards to the Sentinel case here, the approach that was taken by the district, a policy choice that they opted for was an alternative method of tracking particular offsets. Now, what is represented in the Sentinel SIP provision is much more straightforward and simpler than what is in Rule 13.15. Both of them have the same ultimate purpose, which is to keep track of the specific offsets or emission reduction credits and then to have them be verified for Clean Air Act federal offset requirements. I think in terms of the Sentinel tracking system, a convenient analogy is that it is the district opted to present this to EPA was to provide a list of potential offsets that are specific to sources and EPA have dealt with that appropriately. Now, in terms of background, it's useful to note that there is a timing aspect of this that led to their policy choice, but that's simply background information. The district has the discretion under the Clean Air Act to choose between these different approaches. In terms of the SIP revision language that the Petitioners point to in their brief, there is no reference to Rule 13.15. There is no basis for thinking that Rule 13.15, those accounting procedures, which would, if they were applied here, simply be duplicative, that they should be applied in this case. They make an argument that 13.15 applies, but they also make an argument that something has to be, that the procedure can't just be sort of made up on the fly, that you need some procedure that can be reviewed and determined. What's your answer to that? And that was articulated today in oral argument. There is no basis in the Clean Air Act or in EPA's implementing regulations for that. Today we're pointing to 42 U.S.C. 7502 C.5 and 7503. There's nothing in the Act that says that there needs to be a, quote, system that is in place. The requirements are laid forth in the statute that offsets need to essentially be what EPA articulated in its regulations, which is that they need to be permanent, they need to be federal enforceable, they should be quantifiable, and they need to be surplus. EPA values that. Well, what do we do with the argument, which is apparently true, that sometimes we quantify it this way, sometimes we quantify it this way? I mean, it, I guess it looks a little sloppy. Well, I don't know if sloppy is the wrong word, but it just, it seems as though, if I'm looking at a set of data, I like to have one methodology by which to analyze it and to say, even though you have a great deal of discretion, well, sometimes you use it this way, sometimes you use it this way, without an articulation of why is a bit odd. The history of this SIP revision is unique in that it began to be formulated before Rule 1315 had been SIP approved. That was what was submitted to EPA. Rule 1315, the district could have opted to use 1315 and provided a new Sentinel SIP revision to EPA after this case was remanded, but it opted not to. It went with what had been its original approach before Rule 1315 had been approved, and it continued to move forward, which is a very straightforward and very thorough and time-intensive way of validating the credits. In the future, it might be that the district would choose to use 1315 in all circumstances because it has now been SIP approved, but that's not what happened in this case. EPA explained in detail how it went through its assessment of each one of the credits that were listed in the attachment A to the SIP revision and explained how it did its evaluation in regards to quantification and surplus that's laid forth in the record. I would point the court to the differences between the 2010 and the 2012 TSDs, in that you can see that EPA identified a very small number of additional reductions to the SIP revisions that they would include in their evaluation, something like 2%. It's a very small amount, but there were changes that were done in between the two. Those are accounted for in the rule. In terms of the question about EPA approving the rule without looking at the entirety of the listed credits, I'd like to address that briefly. EPA evaluated the vast majority of the districts, approximately 90% of the PM10 and close to 99% of the sulfur oxides. They evaluated those. What remained were individual sources for which there were very small emission reductions for each one of those sources. It would have been extremely labor intensive for the agency to go through and do the evaluation for each one of those. Given that these emission reduction credits have been dedicated specifically to this container of the tracking system and they can't be moved out of it, EPA did not continue to evaluate that long list of sources with very little reward, but instead stopped its evaluation and approved the SIP, and that was reasonable and appropriate in the circumstances. I'd like to speak for a moment about surplus adjustment. I think that this can be a confusing idea. I can provide the court with a specific example to put into context the arguments that the petitioners are making in EPA's response. Take, for example, a boiler that had been operating five years ago and it was shut down. Five years ago, there were rules that addressed the amount of fuel that could be used that were put into the boiler. These rules oftentimes affect, they address the amount of sulfur. When you use a fuel that has sulfur, the emissions that come from it contribute to particulate matter pollution. So there's fuel that's put into the boiler. It's burned. There's emissions that come out. There's some sort of particulate matter. The way that EPA analyzes the amount of emission reductions that result from the shutdown of that boiler, EPA will look at, or the district, will look at the amount of PM10 emissions that would have resulted. That's the amount of emission reduction credit that they could take. But if there is a new rule that goes into place after that boiler shut down, so let's say, previously, when the boiler was operating, it could use a fuel that had a sulfur content of 3%, but subsequently, after the boiler shut down, there was a new rule that was put in place and only fuel with 1% sulfur could be used. What EPA will do in doing a surplus adjustment, it will look at, it will continue to look at the amount of fuel that was used, but the emission factor changes and it will be reduced by two-thirds because that's the amount of sulfur content that would be reduced. And that resulting number, which is going to be significantly lower, is the surplus adjusted emission reduction credits. Now, with that example in place, that's why when EPA does the surplus adjustment, it looks at the rules that were emission control measures, not administrative rules that are in place that address the collection of additional credits. Also, and does not look at BACT. BACT is a, to separate, reasonable available technology, which is sometimes referred to as RACT, is an assortment of rules that are put into place that apply to types of categories, categories of sources. So a boiler, for the example of this fuel rule, that would be a RACT rule. Now, BACT is called best available technology, controlled technology. It's source-specific, and it only applies to either new sources that are being built, or if there's some sort of major modification that's done, there'll be another BACT analysis. It's not a rule that would apply across the board. It only applies to a particular source. So it would be completely hypothetical and speculative to do a surplus adjustment for BACT measures for an analysis presuming that there'd been some sort of major modification to a source, when in fact the source shut down. They simply do not go together. So... Thank you very much. I will conclude on that point, and the district will make additional points. Okay. Good morning. May it please the court, Barbara Baird, Chief Deputy Counsel for the South Coast AQMD. The court has noted that petitioners argue that you can't just make up a system on the fly. That's not what was done in this case. The EPA and the district simply applied the federal integrity criteria that offsets must-be-surplus, permanent, enforceable, and quantifiable as set forth in both the EPA's regulation and the Appendix S to that regulation. And in their technical support document, EPA explained exactly what was meant by those four terms. So going forward, which methodology are you going to use? Well, this is a one-time thing. Sentinel has now been given all its offsets, and this system will not be used again. We'll be using either Rule 1315 for the sources that are exempt or have priority reserve credits, or we'll be using our system for banking private offsets, which is a different system. This system is over and done with. No, I understand that. That's why I was asking. Yes. You asked Judge Thomas to explain why we might use quantified systems differently here. And the reason is simple. It's the difference between this system, which is actually a collection of individual-specific offsets, AAA glass, Blackhawk furniture, et cetera, whereas the bank in 1315 is run on an aggregate basis like a checking account. All the different offsets come into that pile. So when you go to do a surplus adjustment in this system, we looked at what rules went into effect after the sources had shut down that would have applied to those sources and reduced those emissions. We reduced those specific assets for the sources that were subject to that particular rule by 92 percent because that was a reduction we would get, but we didn't do anything to the other sources that weren't subject to Rule 431.2. In 1315, because it's not clear which source provides which offset, when a new rule comes into the system and becomes effective, we look at what are the emission reductions expected from that rule from the universe of sources that would be in 1315. How many tons would we expect to get from that new rule? Then we divide those tons over the entire amount in the bank because we can't say this particular offset came from a source that is subject to the rule and this particular offset came from a source that is not subject to the rule. So we spread it over all the offsets that are in the bank. So instead of a few offsets being reduced 92 percent and other offsets not being reduced at all, you get all the offsets being reduced, say, 5 percent. It's the difference between having a specific identified collection of offsets such as we have here in Sentinel and the banking system. That's why we can use different systems. And also... So in terms of transparency to the public, how do you communicate what system you're going to be using so the public can comment? Well, the preexisting systems, the Rule 1315 and the Reg 13, of course, were district rulemaking processes because we have to put out a proposed staff report and language for the SIP revision 30 days before the governing board hears the matter. People have a public hearing opportunity to testify and comment on the SIP revision. We have an opportunity for people to present evidence at that hearing. That staff report explains the methodology used to calculate the offsets. And then that goes to EPA. That is approved by EPA. EPA goes through a full public comment. In this particular case, the court may recall, we also had a full litigation over this issue before the California Energy Commission in which all the information that was provided to EPA had been provided to petitioners. I see I've used my time. Thank you. Use your time and use Sentinel's time, too. Chief Judge Kuczynski, I wonder if we could let Sentinel have a minute. A perspective, at least. Okay, a minute it is. Thank you. May it please the Court. Mike Carroll with Latham & Watkins on behalf of the intervener, CPP Sentinel, LLC. Notwithstanding the thrashing that the rule was given in the prior case, the petitioners here are arguing that the agencies were obligated to use 1315, the quantification validation protocols in that rule, when they evaluated the credits made available to the Sentinel project. That's not correct. First of all, the Clean Air Act, nor its implementing regulations, dictate that any particular methodology be used. In fact, the cooperative federalism built into the Clean Air Act dictates that the States be given broad discretion to determine the methodology appropriate under the circumstances as was done here. Second, Rule 1315 on its face applies only to sources that access the District's banks via Rule 1304 and Rule 1309.1. Neither of those rules apply to the Sentinel project. Third, Rule 1315 was not in place at the time that the operative action was taken here, which was the District's approval of the SIP revision. Fourth, to the extent that inquiries under State law are relevant here, the petitioners argument that the State law enacted pursuant to Assembly Bill 1318 dictated the use of 1315 is incorrect. To the contrary, that rule said either use the methodology in place prior to Rule 1315 or use a subsequently adopted and approved methodology as was done here. Petitioners also argue that the agencies erred in finding that the credits were quantified and surplus. The agencies applied a very robust protocol to establish that all of the credits dedicated to the Sentinel project met the federal criteria under the Clean Air Act in Appendix S. And finally, the petitioners argue that the failure of the agencies to act on the remainder credits was an error. That's incorrect. The obligation of the agency was to determine that sufficient credits that met the federal criteria were available to support the permitting of the Sentinel project. Once that determination was made in the affirmative, there was no obligation to make further inquiry into the remainder credits. So for all of those reasons, we think that the action of the agency should be upheld. Just very quickly to address the question of why this... You said finally. To address, if I may, just address Judge Thomas' question about why this approach here and why this approach here. Both of the approaches are appropriate and valid under the Clean Air Act and uniquely tailored to the situations. In the case of Rule 1304 and 1309.1, there are hundreds, if not thousands, of permits processed by the districts pursuant to those rules. In that context, it makes sense to have a pre-established system in place so that you're not reinventing the wheel and undertaking a very fact-intensive inquiry with respect to every one of those permits that would be impractical. In the case of Sentinel, this was a one-off. This was something the district was directed to do by the legislature. It was a one-time occurrence, as counsel for the district indicated. Under those circumstances, a more fact-intensive inquiry where the specific offsets were identified made sense. So yes, they're different methodologies, but it's not haphazard willy-nilly. It's different methodologies specifically tailored with good reason to the circumstances of those cases. Thank you very much. Okay, thank you. Just for a quick clarification, I think I had four minutes, so I will take that. Just to clarify for you how long you had. So the first point I'd like to address is this idea that the Sentinel tracking system sets up a container. It does not set up a separate container in this case. In fact, it's very clear that the offsets that are being accessed are offsets in the district's internal bank. So the issue here, and this is referencing back to this notion of equivalency, is that the district has promulgated these rules and EPA has approved these rules, which purport to be equivalent yet yield different results. Now, for example, if Rule 1315 would have been applied and the surplus adjustments would have been applied to the same offsets which are in the Sentinel tracking system, the outcome would have only been around 115,000 pounds per year of PM10 and around 22,000 pounds per year of SOX, which we know from the record are not what are reflected in the AB 1318 tracking system. I'm sorry, the 1318 tracking system. To address the district's point that this was not an on-the-fly decision, I think that this court's ruling recently in August in the Avenal decision is instructive here. The court recently held in the Sierra Club versus EPA or Avenal at 762 F3D 971 that the EPA does not have the authority to waive requirements at will and that no matter how rational, consistent or consistent with congressional intent a particular decision might be, such a decision cannot be made on an ad hoc basis. Now here what EPA is claiming is that they had the discretion to interpret the act in promulgating this specific rule or approving this specific rule, and that is simply not the case. Now to one final point, and that is to the vast majority of offsets having been validated. EPA did not approve a vast majority of offsets. EPA approved the whole of the offsets in the 1318 tracking system. And with regard to the surplus adjustment claim, there is no requirement that the surplus adjustment take place at the point of closure. The act is quite clear that the pollution reduction, the reduction in emissions not be otherwise required by the act. Now the fact that they've simply chosen the shutdown as some form of magical moment does not find any support in the act. Thank you.
judges: Kozinski, Thomas, Gould